UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

LARRY W. ASHWORTH,

        Plaintiff,

v.

KERR MCGEE CHEMICAL CORP, et al.,

        Defendants.

Civil Action No. 2:20-CV-00053

Judge James D. Cain, Jr.
Magistrate Judge Carol B. Whitehurst

**AFFIDAVIT OF BILL HOUSEHOLDER IN FURTHER SUPPORT OF PLAINTIFF'S SUR-SUR-REPLY BRIEF IN SUPPORT OF HIS MOTION FOR PRELIMINARY APPROVAL OF MODIFIED SETTLEMENT WITH OCCIDENTAL AND ANADARKO**

I, Bill Householder, pursuant to 28 U.S.C. § 1746, declare:

1. I am a hydrogeologist and owner of Gaia Environmental, Inc. and a contractor for Tolunay-Wong Engineers, Inc. ("Tolunay-Wong") and my CV is attached hereto as **Exhibit 1**.

2. I was hired by Sanders Law Firm, LLC, counsel for Plaintiff Larry W. Ashworth ("Plaintiff") and the putative class, to perform water and soil testing at three properties south of the American Creosote Superfund Site (the "Superfund Site").

3. I have worked in the environmental testing industry for more than 30 years and have utilized fate and transport modeling to determine groundwater plume boundaries and how contaminants are spread by surface water. As part of my retention in this matter, I have reviewed relevant meteorological data dating back from early plant operations on the Superfund Site through the present to help determine where contaminants from The Superfund Site have likely spread over the years.

4. Defendants' counsel's objectively false statements are belied by their own evidence. In their opposition, Defendants attaches the "Remedial Investigation Report American

1

Creosote Deridder Superfund Site, Deridder, Beauragrad Parish, Louisiana EPA Identification No. LAN000604293." (Exhibit 10, ESF 143-12). This report definitively contradicts Defendant's false uphill waterflow narrative.

5.   The pertinent portion of my prior Affidavit that should have made clear to Defendants that I indeed dispute their false statement that Ashworth is 30+ feet, or three stories *above* the Superfund site, reads:

> [P]roperties located between the southeastern boundary of the American Creosote DeRidder Superfund Site and the southeastern boundary of Mr. Ashworth's property that also lie within the footprint of the **downgradient floodplain** and subsurface aquifer that flows southeast from the boundary of the American Creosoting DeRidder Site could exhibit contaminant levels comparable to those noted above.

(ECF-147-4) (Affidavit of Bill Householder in Support of Plaintiff's Motion for Preliminary Approval of Modified Settlement With Occidental and Anadarko) (emphasis added).

6.   In giving that statement under oath, I offered an opinion which is directly opposite to what Defendants now argue. To that extent, I will, again, directly dispute Defendants' unfounded argument by herein referencing Defendants' previous statements:

> There is no evidence that surface water from the Shreveport Creosoting and IP facilities contaminated Plaintiff's soil. That is not surprising, because surface water must travel 5.1 miles and climb more than 30 feet simply to reach Plaintiff's property. Even Mr. Householder does not contest that dispositive fact. (ECF 151) ((International Paper Company's and BNSF Railway Company's Joint Memorandum in Opposition to Plaintiff's Motion for Preliminary Approval of Modified Settlement with Occidental and Anadarko) at 12).

> Finally, Plaintiff, Anadarko, Occidental, their counsel, and Mr. Householder have had repeated opportunities to take up the gauntlet and explain how contaminants from the Superfund Site purportedly climbed the 30+ foot hill to Plaintiff's property (that is three stories, up). They have not, because they cannot, because that just would not happen in this universe. (ECF 158) ((IP's Sur-Reply in Opposition to Plaintiff's Motion for Preliminary Approval of Modified Settlement with Occidental and Anadarko) at 6).

7.  Counsel's proffered understanding of the Superfund site's elevation is nonsensical and in direct contradiction to the Defendants own documentary evidence. Elevation of the Superfund site ranges from 175 to 190 feet above sea level according to Table 3-1 of the April 2021 Remedial Investigation Report, attached hereto as **Exhibit 2**, which is taken from the same Report that Defendants attached as Exhibit 10 to their Opposition (ECF 143-12 at 7009). The Ashworth Property elevation is 142 feet above sea level (as attested to by IP's expert, Richard Harrell, under oath) (ESF 122-6). Surface water runs downhill (as also to attested by Mr. Harrell), which means the surface water, and any contaminants it has carried, started anywhere from 175 to 190 feet above sea level, which is *plainly higher than* Mr. Ashworth's 142 feet above sea level property.

8.  By adopting defendants' multi story building example, the Superfund Site is 33-48 feet, (three to 5 stories) **higher not lower**, than the Ashworth property. It is not in dispute that at least some surface water from the Superfund Site flows to the south and southeast. Additionally, the Groundwater elevation contour map from the 2021 Remedial Investigation Report, attached hereto as **Exhibit 3**, show groundwater elevations ranging from 174.36 fmsl to 167.72 fmsl and flowing to the east/southeast away from the superfund site, towards the Ashworth property.

9.  The maps and elevations are consistent with my prior statements and the proposed modified settlement class boundaries.

10. Defendants' counsel also relays unfounded attacks on the RECAP numbers utilized in my previous comparison of sampling results between three different sites and the Superfund Site. In performing that comparison, I used "Table 1" of the Louisiana Department of Environmental Quality (LDEQ) Risk Assessment/Corrective Action Program (RECAP) which is attached hereto as **Exhibit 4**.

3

11.     The numbers in my table derive directly from "Table 1" which is also the "Soil and Groundwater Screening Standards" table.  In presenting my table, I converted the scientific notation of the Table 1 Screening Standards to decimal numbers to better illustrate the comparison. These calculations and numbers are accurate and in compliance with generally acceptable scientific standards.  For example, in Table 1, the number for GWSS Phenanthrene 1.8E-01 is 0.18.  The same number is used in my table.  Accordingly, despite counsels' allegations, no order of magnitude error exists.

12.     Counsel for IP, who proffers apparent scientific knowledge, has apparently used numbers from a different—and inappropriate—table in an attempt to dispute my findings. Counsel apparently chose "LDEQ RECAP Table 3 Management Standards," which are only to be used when determining the extent of contamination in an official LDEQ approved remedial action proceeding. Management Standard numbers are inappropriate for these sites as they are still in the screening process and have not progressed to investigation and LDEQ approved remediation. Therefore, the screening standards of Table 1, not Table 3, are appropriate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  December 18, 2023

By: _____
William J. Householder, P.G.
*Hydrogeologist*

4