UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| ROSE L. EPPERSON, Individually | : | Case No. 2:20-cv-00053-JDC-KK |
| and as class representative for all similarly situated persons | : | Hon. James D Cain, Jr. |
| | : | |
| v. | : | |
| | : | |
| INTERNATIONAL PAPER COMPANY KERR-MCGEE CHEMICAL CORPORATION KERR-MCGEE OPERATING | : | |
| CORPORATION ANADARKO PETROLEUM CORPORATION OCCIDENTAL | : | |
| PETROLEUM CORPORATION BNSF RAILWAY COMPANY | : | |

### SECOND AMENDED PETITION FOR DAMAGES AND INJUNCTIVE RELIEF AND FOR CLASS ACTION RELIEF FOR ALL SIMILARLY SITUATED PERSONS

### PRELIMINARY STATEMENT

A tremendous amount of land owned and/or lived on by Plaintiff's and putative class members to this lawsuit, is polluted as a direct result of Defendants' tortious actions and inactions over the years. These Defendants have a long history of creating toxic waste and allowing toxic waste to escape from various creosoting operations in multiple states. These Defendants have been held accountable in the billions of dollars for creosoting related pollution. Defendants are no strangers to allowing toxic waste to contaminate other people's land and water.

The original class representative, Larry W. Ashworth ("Ashworth"), discovered within the year before he commenced this action, the extent of the toxic waste contamination, which is exemplified by the photographs in Exhibit "2." These photographs show toxic waste, with chemical constituents indicative of creosote by-products, percolating up into Ashworth's yard.

This toxic waste has only one possible source: the creosote treatment sites to the North of the Ashworth's yard, which is approximately 5.1 miles to the southeast of both creosote treatment sites. The most obvious source for this contamination is surface runoff or creosote contaminated groundwater from the American Creosote Superfund Site and/or the International Paper DeRidder Creosote Site, adjacent thereto. The only conclusion that can be drawn from these photographs, statements made by public officials, and hard scientific evidence associated with the photographs, is that there is more likely than not, an enormous toxic waste plume stretches in some form or fashion at least 5.1 miles from the original sites of contamination.

This toxic waste plume is continually trespassing on innocent people's property and poses health risks to all who come into contact, in anyway, with the plume's by-products. This lawsuit, if there is no other sufficient remedy, seeks to give affected class members the ability to relocate to uncontaminated property of their choosing, of similar size etc., to alleviate the likelihood that the toxic waste, will harm them if they have to remain in the zone of impact of the original sites of contamination, and otherwise medical monitoring, compensatory and punitive damages as allowed by the law.

NOW INTO COURT, through undersigned counsel, comes Rose L. Epperson ("Epperson" or "Plaintiff"), both individually and as class representative for the putative classes described herein and below, who files this Petition for Damages and Injunctive Relief, to wit:

**1.**

Made Defendants herein are:

i)     INTERNATIONAL PAPER COMPANY, a foreign corporation with its principal place of business in Memphis, Tennessee, authorized to do and doing business in the State of Louisiana, and whose registered agent for service of process is CT Corporation System, 5615 Corporate Blvd., Suite 400B, Baton Rouge, La. 70808, hereinafter

referred to as "IP";

ii)      KERR-MCGEE CHEMICAL CORPORATION, a foreign corporation with its principal place of business in Oklahoma City, Oklahoma, who is authorized to do and did business in the State of Louisiana, and whose registered agent for service of process is CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, La. 70816, hereinafter referred to as "Kerr-McGee";

iii)     KERR-MCGEE OPERATING CORPORATION, as successor in interest to Kerr-McGee Corporation, a foreign corporation with its principal place of business in Oklahoma City, Oklahoma, who was authorized to do and did business in the State of Louisiana, and whose registered agent for service of process is CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, La. 70816, hereinafter referred to as "Kerr-McGee Operating";

iv)      ANADARKO PETROLEUM CORPORATION, a foreign corporation with its principal place of business in The Woodlands, Texas, who was authorized to do and did business in the State of Louisiana, and whose registered agent for service of process is CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, La. 70816, hereinafter referred to as "Anadarko";

v)       OCCIDENTAL PETROLEUM CORPORATION, a foreign corporation which was authorized to do and did business in the State of Louisiana which has a current domicile in Los Angeles, California, and which may be served through its registered agent for service Mr. John W. Allen, 10889 Wilshire Blvd., Los Angeles, Ca. 90024, hereinafter referred to as "Occidental";

vi)      BNSF RAILWAY COMPANY, as successor to Burlington Northern and Santa Fe Railway Company, and Burlington Northern Railroad Company, a foreign juridical

entity with its principal place of business in Fort Worth, Texas, who is authorized to do and doing business in the State of Louisiana, and whose registered agent for service of process is CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, La. 70816, hereinafter referred to as "BNSF".

## JURISDICTION AND VENUE

### 2.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(d)(1), (d)(2) in that this matter is filed as, by and on behalf of representatives similarly situated to others as defined and proposed below, the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs, and the Plaintiff and class representatives are citizens of the State of Louisiana and are diverse from the citizenship of all of the Defendants and/or minimal diversity is present.

### 3.

Venue is proper in the Western District of Louisiana under 28 U.S.C. §1391 (b)(2), and/or (d) as to all Defendants, or their predecessors in title, and all Defendants have had long standing and numerous purposeful economic contacts and commercial activity, as well as tortious activity, as well as owning immovable property or property rights in immovable property, in Beauregard Parish, State of Louisiana, since at least 1957, such that *in personam* jurisdiction is properly asserted over all of the Defendants, and a substantial part of the events, omissions, and culpable conduct giving rise to the claims herein took place in Beauregard Parish, which is located within the Western District of Louisiana.

## JOINDER OF PARTIES

### 4.

The joinder of the Complainant's/Plaintiff's claim, individually and as class representative against the several Defendants, is proper pursuant to FRCP 20 since the rights asserted arise out

of the same, repetitive transactions and occurrences by IP, Shreveport Creosoting Company, American Creosoting Company, KERR-MCGEE CHEMICAL, KERR- MCGEE OPERATING, ANADARKO, OCCIDENTAL, and BNSF, as set forth below, with respect to their activities which resulted in large amounts of toxic pollution which have negatively impacted the Plaintiff's property, and undoubtedly exposed all putative class members to toxic fumes and physical contact contamination that has caused physical damage to them as well as the property on which they live and in many cases own, and there are numerous questions of law and fact common to Plaintiff, all class members and all Defendants with regard to the liability of the Defendants, as well as the damages and injunctive relief sought by the Plaintiff  in this case against the Defendants. Additionally, all Defendants are liable *in solido* for their tortious activities which have caused the Plaintiff and members of the class damage and harm.

## FACTUAL BACKGROUND

### 5.

In approximately 1918, a creosoting plant was constructed by Shreveport Creosoting Company near DeRidder, Louisiana. The land had previously been owned by the Longbell Lumber Company ("Longbell"), which continued to own property adjacent to and near the creosote plant.

### 6.

Upon information and belief, Longbell and Shreveport Creosoting Company both managed and operated the creosote plant to produce creosote treated pine poles. Following the cut and creosote treatment of the pine poles, the poles were shipped via BNSF for sale on the open market. This area, southeast of DeRidder, is so named Parcel B on the attached Exhibit  "1."

### 7.

In approximately 1957, IP bought Longbell, or Longbell merged with IP as the surviving entity, and IP acquired ownership of the Longbell creosoting plant site. IP continued to operate the

creosote plant at the Parcel B location until approximately 1963, when IP sold the plant site to a third party, and upon information and belief, creosoting operations ceased at the Parcel B location after IP divested itself of the property and plant.

**8.**

On information and belief, on or about 1963, IP took over whatever wood creosoting operations Shreveport Creosoting Company or its parent company, American Creosoting Company were still performing in Beauregard Parish, and creosoting operations and plant to a site on the north end of the property IP owned which is labeled Parcel "A" on the attached Exhibit "1" overhead photograph.

**9.**

The Defendants, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO AND OCCIDENTAL, are all ancestors/successors in title to Shreveport Creosoting Company and its parent company, American Creosoting Company and therefore are responsible for any and all liabilities with respect to the hazardous chemicals and pollution which was left on Parcel "B" by their predecessors in title and, as stated below, liable to Complainants since said pollution has migrated to and under the Complainants' properties.

**10.**

BNSF and its predecessors, upon information and belief, owned certain right of ways and land in and near parcels "A" and "B" upon which the creosoting products were stored and/or loaded and transported on railways used and owned by BNSF for commercial sale. BNSF thus had custody and control of such creosoted products which resulted in the toxic and hazardous by- products of the creosoting process, listed below, being spilled, allowed to be leached from storage facilities, or otherwise BNSF allowed the contamination/pollution to be released into the environment on BNSF controlled property from the inception of the creosoting operations/business to its cessation

on or about 1989, when IP halted its creosoting operations.

### 11.

IP continued its creosoting operations on the property, Parcel "A," until 1989 according to The Affidavit of Documentation filed in The Beauregard Parish Clerk of Court's Office that same year, and that "K001 sludge," which it identified as hazardous waste, as opposed to the toxic waste the EPA classifies it as, had been removed. However IP's representative admitted in those filings that toxins, (believed to be toxic waste according to EPA classifications), remained in the sediment on the site, and it appears axiomatic that the toxic waste was a direct result of IP's creosoting operations as per Environmental Protection Agency definitions: "bottom sediment sludge from the treatment of wastewaters from wood preserving processes that use creosote and/or pentachlorophenol."

### 12.

IP is still the owner of Parcel "A" as of the filing of this suit and of course was a substantial cause of toxic waste pollution created and left on Parcel "B," which, sites combined, are a major cause of the toxic plume and resulting damages complained of in this suit. As stated above, Shreveport Creosoting Company and its parent company, American Creosoting Company, were the initial operators of the creosoting facility and polluters regarding Parcel "B" before the sale to IP, and the Defendants KERR-MCGEE, KERR-MCGEER OPERATING, ANADARKO, and OCCIDENTAL are the ancestors/successors in title to those two entities which no longer exist or operate.

### 13.

The operations at both creosote plant sites operated and owned by IP included the pressure treating of utility poles and wooden pilings with creosote, wolmanizing solution, naphthalene, diesel, and pentachlorophenol ("PCP"). The plant facilities consisted of administration and office

buildings, a laboratory, and equipment and space for pressure treating and storing creosote treated and untreated wood.

**14.**

IP's purpose for pressure treating the wooden poles and pilings was to preserve the wood's integrity and longevity for its various industrial and construction purposes, and to then sell the treated wood on the open market.

**15.**

As part of IP creosote operations on Parcels "A" and "B," IP controlled the operation of multiple earthen surface impoundments utilized to hold/store wastewater generated in the pole treatment process and for the recovery of chemicals utilized in the creosoting processes. On information and belief, there was at least a Holding Pond, two (2) Evaporation Ponds, a PCP Recovery Pond, a Creosote Recovery Pond, three (3) Wastewater Ponds, a Sludge Pond, a Drip Pad, and an unknown number of creosote wood storage areas, which IP controlled.

**16.**

Throughout the operations at Parcels "A" and "B," none of the treatment ponds or facilities were lined to prevent the leaching of contaminants into the surface and subsurface environments. IP knew that the ponds contained hazardous and toxic wastes generated by the pressure treating operations yet did nothing to try to prevent such leaching from its ponds and flowing through the sediments outside property owned and controlled by IP into and onto innocent adjacent property owned by Plaintiff herein and putative class members.

**17.**

Upon information and belief, based on the same sort of toxic waste found in Parcel "A" and Parcel "B" soil and ground water, IP, Shreveport Creosoting Company and its parent company, American Creosoting Company, apparently conducted the same or similar creosoting operations

on both parcels.

**18.**

The various toxic chemicals used in the wood treatment process were pumped, transported or otherwise drained through the various ponds in succession during the industrial treatment processes in an attempt at recovery of some of the chemicals, but IP knew that toxic chemicals were allowed to leach into the soils and ground waters lying beneath and surrounding the unlined earthen impoundments.

**19.**

IP and BNSF have drilled wells on the sites in question and discovered contamination in the soil and waters underlying the creosote plant sites. According to the EPA well list, IP had drilled at least 46 monitoring wells in 1986 and they continue to monitor at least 56 wells in total, while BNSF has drilled and maintains at least 3 monitoring wells in and around Parcels "A" and "B."

**20.**

In subsequent years, IP further learned that the contamination of toxic chemicals from its creosoting operations had not only leached, spilled and migrated from the treatment ponds and IP's plant facilities into surrounding soils and ground water, but had migrated well beyond IP's current and previously controlled and owned properties, and we now know that the toxic waste contamination plume extends all the way to Ashworth's property, which is approximately 5.1 miles from the currently owned and controlled sites by IP, as well as the previously owned sites of operations of the Shreveport Creosoting Company and its parent company, American Creosoting Company.

**21.**

Testing of ground water in the subsurface sands which comprise the upper portions of the Chicot Aquifer, the DeRidder area principal source of fresh drinking water, revealed the same toxic compounds which were/are the result of IP's, and Shreveport Creosoting Company and its parent company, American Creosoting Company's, creosoting operations, which include but are not limited to benzene, ethylbenzene, toluene, xylene, creosols, naphthalene, phenol, PCP, acenaphthene, phenanthrene, flourene, dibenzofuran, and a host of other toxic hydrocarbon compounds.

**22.**

IP has done little to stop the migration of the toxic chemicals it created and released from its creosoting operations and the migration has progressed both horizontally and vertically through surface run off and unabated leaching which continues after more than thirty years since IP ceased creosoting operations at the 2 sites. IP's only attempt to control the pollution was through a ground recovery system which was poorly designed by IP, i.e. IP's intentionally narrow assessment of the site and the pollutants, and which has not mechanically functioned properly, such that IP knew its efforts at stopping the migration were deficient and allowed the pollution to continue to spread virtually unabated onto, under, and in Ashworth's property and IP never to this day has warned any of the putative class members that the putative class member's property is being actively trespassed on and under by toxic chemicals IP created and released, which cause great danger to human health of those putative class members and their families.

**23.**

The Defendants KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, OCCIDENTAL, and BSNF, as well as their predecessors, have done nothing to stop the migration of the toxic chemicals despite knowing of same and of the source.

**24.**

Ashworth's property is located south of the contaminated Parcels "A" and "B" with a municipal address of 989 Hwy 394, DeRidder, Louisiana, 70634 and described as follows:

> COMMENCE AT THE NORTHEAST CORNER OF THE SE/4 OF NE/4 OF SECTION 30, TOWNSHIP 3 SOUTH, RANGE 8 WEST, THENCE SOUTH 0 DEGREES 24MINUTES EAST 642.53 FT.; THENCE SOUTH 89 DEGREES 26 MINUTES 01 SECOND WEST 60.0 FT. TO THE POINT OF BEGINNING; THENCE SOUTH 89 DEGREES 26 MINUTES 01 SECOND WEST 332.0 FT.; THENCE SOUTH 0 DEGREES 24 MINUTES EAST 331.79 FT. TO THE NORTHERLY RIGHT-OF WAY- OF LA. HWY #394; THENCE SOUTH 70 DEGREES 05 MINUTES 38 SECONDS EAST ALONG SAID RIGHT-OF-WAY 354.16 FT.; THENCE NORTH 0 DEGREES 24 MINUTES WEST 455.67 FT. TO THE POINT OF BEGINNING, CONTAINING 3.0 ACRES, MORE OR LESS.

**25.**

Epperson moved to Deridder at the age of two in approximately 1951-1952, when she was adopted. She lived at the address of 119 Cedar Street, Deridder, Louisiana, 70634. At her Deridder home, Epperson almost immediately began suffering from childhood asthma and bronchitis. Epperson grew up living in close proximity to what is now the American Creosote Superfund Site and the adjacent International Paper DeRidder Creosote Site. Epperson lived at 119 Cedar Street until about 1968. Then, when she was approximately nineteen years old, Epperson moved to 605 Elton Mango Drive, Deridder, Louisiana, 70634. Epperson has lived at 605 Elton Mango Drive ever since, including at the time this action was commenced. At twenty-two years old, Epperson began suffering from hypertension, which she still suffers from to this day.

**26.**

To date, IP has not notified or warned the Plaintiff, or made any public disclosures, other than theoretically the filing of a document in 1989 into the records of the Parish Clerk of Court that in no way delineates the scope of the plume contamination to innocent property owners, and is in no way something that would alert even the most diligent private property owner would have any reason to go start searching Clerk of Court Records for such a document. Indeed, none of the putative class members were aware of any notification that their private property was affected with toxic waste generated by IP, and all such private homeowner's addresses were easily obtainable by IP to send direct mail notifying them of such toxic waste contamination had they cared one bit about the health and safety of individuals and the sanctity of the putative class member's property. They have sent nothing to the surrounding communities, nor warned the neighboring public in general that extremely toxic and hazardous chemicals were migrating via ground  waters  and surface run off from its former plant sites onto adjacent and surrounding properties hydrologically "down-stream" and several miles away from the plant sites. On the contrary, IP has done all in its power to keep the facts of its culpable conduct and resulting pollution it has caused silent and has engaged in a conspiracy of silence for more than thirty (30) years regarding such contamination. Ashworth became aware of the contamination under and on his property only after witnessing dark colored thick liquid coming from the ground after disturbing the ground by the extraction of a tree stump. This occurred less than one year prior to the filing of this action.

## 27.

Further evidence of IP's concerted efforts to keep its culpability and pollution secret is found in its 1995 contract with a construction company which performed demolition and other work on IP's plant site in which "Article 28" of the contract required all information made known to the contractor by IP was to be kept confidential, and International Paper Company's name was not even allowed to be mentioned to any third party by the contractor:

"…remain the exclusive intellectual property of International Paper Company and shall be treated by the Contractor as proprietary and shall not be disclosed or used, except in the implementation of this Agreement, without prior written approval of COMPANY'S Director-Purchases. The purchase of Contractor's material/service does not authorize the Contractor to use the name of or make reference to International Paper Company for any purpose in any releases for public or private dissemination, nor shall the Contractor divulge or use in any advertisement or publication any specifications, data, or other information pertaining to or relating to this usage without prior written approval of COMPANY'S Director-Purchases."

### 28.

Many of the chemicals allowed to be released by IP from its property onto and under the class members' property are toxic, dangerous, and likely to cause detrimental health effects to the class members, including but not limited to cancer, reproductive issues, strokes and other medical problems associated with exposure to creosote and creosote by-products. Some class members have experienced symptoms after breathing the noxious fumes from the viscous liquid which has appeared on their properties, and such symptoms are consistent with exposure to the hazardous compounds spilled and released by the Defendants which they have allowed to migrate to class members' properties. Such exposure creates a significantly increased risk of contracting latent disease(s), the risk of which is greater than if class members had not been exposed to said chemicals and pollution, and greater than the risk of members of the public at large developing such disease(s) who have not been exposed to the chemicals involved herein.

### 29.

The land in which IP conducted its creosoting operations on Parcel "B" was declared a

"Super Fund" contaminated site by the United States Environmental Protection Agency and was made a part of the Louisiana Department of Environmental Quality Inactive and Sites Division in 1991.

### Count I-Negligence

**30.**

The wood treating industry has known for many years through trade journals and similar publications, including the time period in which IP operated both creosote plant sites/locations, that their operational processes and chemicals used therein were toxic to both humans and the environment. The industry, including IP, knew that unlined earthen impoundments to treat and store wood processing/treatment wastes resulted directly in the discharge of chemicals into the surrounding soils, nearby surface waters, and underlying ground waters.

**31.**

While knowing of the seepage and percolation of the panoply of toxic waste and hazardous chemicals from its operations into subsurface soils and ground water, Shreveport Creosoting Company and its parent company, American Creosoting Company, and IP continued to store and dispose of its waste waters in this manner as a means of minimizing disposal costs at the expense of the protection of the environment and ultimately at the cost of human health, safety, and welfare. In the face of such knowledge, Defendants Shreveport Creosoting Company's and its parent company, American Creosoting Company, and Defendant IP's continued use of its impoundments for the management of these toxic wastes was intentionally tortious, negligent, unreasonable, and in reckless disregard for the health and safety of the public, and such practices and conduct have substantially contributed to the pollution of the soils and ground water in and under the putative class member's property.

**32.**

Defendants Shreveport Creosoting Company and its parent company, American Creosoting Company, and IP also negligently allowed toxic and hazardous wood treating toxic wastes and chemicals to be discharged into subsurface soils and ground waters, all of which have arrived under and at the putative class members' properties, by allowing continuous leaks, spills, and discharges from pumps, storage tanks, tank water draws, sampling activities, pressure release valves, flanges, pipelines, chemical storage areas, and other similar operating equipment located at the facilities formerly operated by IP, Shreveport Creosoting Company and its parent company, American Creosoting Company.

**33.**

Neither IP, Shreveport Creosoting Company, American Creosoting Company, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, or OCCIDENTAL have ever removed enough of the sludge and waste materials from the various impoundments and other solid waste management units located on the facilities to stop the toxic waste's migration to innocent property owners, but IP at one time only placed a clay cap to minimize rain intrusion, thus the source of the contamination remains and the polluted impoundments serve as an ongoing source of the contamination of subsurface soils and ground water underlying the putative class members' properties.

**34.**

The continued discharges from Parcels "A" and "B", as well as the land controlled by BNSF, due to the Defendants' knowing, and calculated failure to remediate and remove the polluted and toxic soils and water beneath their current or formerly owned/controlled property constitutes affirmative conduct and tortious omissions which constitute a continuing tort and continuing damages for which all Defendants are liable unto the putative class members.

**35.**

IP as well as all other Defendants further had a duty, even after creosote operations at the two plants/locations ceased, to prevent further migration of toxic waste from the property and failed to take any reasonable or responsible measures to curtail or stop such migration, and also failed to warn Plaintiff or the public at large of the presence of the toxic chemicals which have migrated miles from the creosoting plants' locations. Such omissions and commissions are negligent and unreasonable.

**36.**

The continued discharges from IP's property due to IP's knowing, and calculated failure to remediate and remove the polluted and toxic soils and water beneath its property constitutes affirmative conduct and tortious omissions which constitute a continuing tort and continuing damages for which IP is liable unto the putative class members.

**37.**

The damages suffered by the Plaintiff and members of the class(es) have been proximately caused by the Defendants' reckless, negligent and grossly negligent conduct, acts, omissions and commissions as further described below:

a.  IP's, Shreveport Creosoting Company's, and American Creosoting Company's, and BNSF's failure to ensure that all wood treating equipment, pumps, tanks, tank dikes, pipelines, storage and transport equipment and facilities were properly operated, maintained and inspected;

b.  IP's, Shreveport Creosoting Company's, and American Creosoting Company's, and BNSF RAILWAY COMPANY's failure to properly implement safe practices to avoid the discharge, leakage, and seepage of pollution on and then from the property used by IP, Shreveport Creosoting Company, and American Creosoting Company, and BNSF

RAILWAY COMPANY;

c.  IP's, Shreveport Creosoting Company's, and American Creosoting Company's, and BNSF RAILWAY COMPANY's failure to properly direct, and supervise the training of employees and contractors in safe and protective practices which would have protected the environment and prevented pollution;

d.  IP's, Shreveport Creosoting Company's, and American Creosoting Company's, and BNSF RAILWAY COMPANY's failure to provide timely and adequate warning to neighboring and community land owners on whose property wood treating wastes and chemicals have trespassed as to the scope and extent of the hazardous and toxic chemical releases from IP's, Shreveport Creosoting Company's, and American Creosoting Company's, and BNSF RAILWAY COMPANY's operations;

e.  IP's, Shreveport Creosoting Company's, and American Creosoting Company's failure to develop, implement, or follow reasonably prudent maintenance procedures governing the inspection, maintenance, and repair of wood treating facilities and equipment which were in disrepair, faulty, dilapidated, and in a state of ruin while said Defendants were operating same in its wood treating plants;

f.  IP's, Shreveport Creosoting Company's, and American Creosoting Company's and its ancestors in title, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, OCCIDENTAL, as well as BNSF's failure to prevent the continued offsite migration of contaminants resulting from the discharge of wood treating wastes and chemicals into the environment;

g.  IP's, Shreveport Creosoting Company's, and American Creosoting Company's and its ancestors in title, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, OCCIDENTAL, as well as BNSF's failure to comply with all state laws and regulations

regarding record keeping and the reporting of continued discharges of wood treating wastes into the environment and the resulting adverse environmental impacts;

h.  IP's, Shreveport Creosoting Company's, and American Creosoting Company's and its ancestors in title, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, OCCIDENTAL, as well as BNSF's failure to remediate contaminated lands and facilities, i.e., including but not limited to the surface impoundment units and solid waste management units, in such a manner as to eliminate such lands as a continued source of subsurface soil and ground water pollution to on site, adjacent, and off-site properties;

i.   IP's, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, OCCIDENTAL, as well as BNSF's failure to implement and ensure the operation of a competent remedial system(s) designed to prevent further migration of wood treating wastes and chemicals into soils and ground water on IP's currently owned and formerly owned land, as well as the migration thereof beyond and onto the putative class members' property;

j.  IP's, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, OCCIDENTAL, as well as BNSF's failure to properly evaluate and assess the true scope and extent of contamination into the subsurface environment in order to be able to design and implement an effective and reasonably prudent remedial system;

k.  IP's, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, OCCIDENTAL, as well as BNSF's failure to abide by and follow the applicable rules, regulations, and permits governing wood treatment facilities, hazardous waste treatment and disposal facilities, solid waste treatment and disposal facilities, surface and storm water handling, management, and treatment facilities, and operations pursuant to the Louisiana Environmental Quality Act.

**38.**

For the above grossly negligent acts as well as negligent acts of omission and commission IP, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, OCCIDENTAL, as well as BNSF are all liable *in solido* to Plaintiff and putative class members pursuant to LSA-C.C. articles 2315.

## Count II-Strict Liability[1]
### 39.

The pollution of the putative class members' property was caused directly by Defendant IP's, as well as by Shreveport Creosoting Company's, and American Creosoting Company's, wood treating operations conducted on their properties and IP, Shreveport Creosoting Company, and American Creosoting Company had custody, control, and garde of all such damaging chemicals, equipment and facilities/property, which continue to cause the pollution described herein which has not abated. IP, Shreveport Creosoting Company, and American Creosoting Company, and therefore its successors/ancestors in title, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, and OCCIDENTAL are thus strictly liable *in solido* for the unreasonably dangerous conditions posed by the migration of its wood treating waste chemicals onto the putative class member's property under LSA-C.C. arts. 667, 2317, 2317.1, and 2322.

### 40.

The Defendant BNSF had custody and control of the creosoted timbers and stored damaging chemicals on its property such that it had custody, control, and garde of damaging chemicals associated with the creosoting process which continue to cause the pollution described herein which has not abated. BNSF is strictly liable under LSA-C.C. arts. 667, 2317, 2317.1, and

---

[1] The Court dismissed Count II (Strict Liability) as pleaded in the original complaint.  ECF 25 and 38.  Plaintiff re-asserts Count II in this proposed Second Amended Complaint for the purpose of expressly preserving all rights on appeal and precluding any inference that the Plaintiff has abandoned Count II.

2322 for the unreasonably dangerous conditions posed by the migration of the wood treating waste chemicals for which it had custody and control and which have migrated onto the putative class members' property.

## Count III-Continuing Nuisance and Trespass[2]
### 41.

The reckless, negligent, and unreasonable conduct of IP, Shreveport Creosoting Company, and American Creosoting Company and its ancestors in title, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, OCCIDENTAL, as well as BNSF and their failure to act reasonably, which has resulted in the discharge of wood treating toxic wastes into the environment and on/under the putative class members' property, constitutes a continuing nuisance and continuing trespass. Such continuing nuisance and continuing trespass results in continuing tortious conduct and damages. The damages which have affected the putative class members' property by such trespass will thereby continue until the Defendants take the necessary action to abate the migration from the aforementioned properties.

## Count IV-Liability for Punitive Damages
### 42.

IP, Shreveport Creosoting Company, and American Creosoting Company generated, stored, transported, handled, or otherwise managed toxic and hazardous wood treating wastes long before 1984 and the pollution began migrating off of IP's property and caused extensive damage to the putative class members' properties between the years of 1984 and 1996, as well as to the present. Further, the successors of Shreveport Creosoting Company, and American Creosoting Company, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO and OCCIDENTAL

---

[2] The Court dismissed Count III (Continuing Nuisance and Trespass) as pleaded in the original complaint.  ECF 25 and 38.  Plaintiff re-asserts Count III in this proposed Second Amended Complaint for the purpose of expressly preserving all rights on appeal and precluding any inference that the Plaintiff has abandoned Counts III.

took  no action to try to abate the migration between the years 1984 and 1996 when they knew such pollution was migrating from Parcel "B" which had been owned by their predecessors in title. IP's, Shreveport Creosoting Company's, and American Creosoting Company's acts in generating, storing, transporting, and handling of the toxic substances, as well as KERR- MCGEE,  KERR-MCGEE OPERATING, ANADARKO, and  OCCIDENTAL's  failure  to  act, were in wanton or reckless disregard for public safety for all of the reasons stated above, as well as due to the facts that IP, Shreveport Creosoting Company, and American Creosoting Company:

 a. Actively disposed of toxic waste and chemicals from their facilities through surface discharges and run off, waste injection/percolation impoundments, leaks, spills, and discharges from pumps, pipelines, tanks, wells, and other facilities known to be worn, leaking, or deteriorated;

 b. Failed to remediate or mitigate the continued discharge of toxic chemicals and waste from the impoundments as well as abandoned equipment which IP, Shreveport Creosoting Company, and American Creosoting Company knew was spreading contaminated waste into the subsurface soils and ground water and which these Defendants knew had migrated off site to the putative class member's properties; and

 c. Failed to properly inspect or maintain or operate their equipment and facilities to ensure that the chemical wastes produced during the wood treatment processes were not discharged into the environment or onto the putative class member's properties.

**43.**

 Further, BNSF's predecessors stored, transported, handled, or otherwise managed toxic and hazardous wood treating wastes long before 1984 and the pollution began migrating off of BNSF controlled property and caused extensive damage to the putative class members' properties between the years of 1984 and 1996, as well as to the present. BNSF's deficient conduct in the storing,

handling and transport of the toxic materials as described above was in wanton or reckless disregard for public safety for all of the reasons stated above in the preceding paragraphs.

**44.**

The wanton and reckless conduct of the Defendants entitles the Plaintiff and class members to punitive damages under former LSA-C.C. art. 2315.3.

## **Class Allegations**

**45.**

The Plaintiff, Ms. Epperson, is a property owner who resides in DeRidder, Louisiana.  At twenty-two years old, Ms. Epperson began suffering from hypertension, from which she still suffers to this day.  According to the American Heart Association, lead, cadmium and arsenic can contribute to heart related issues such as hypertension.  Soil tested at the two sites within the putative Class contained all three of these metals.  Scientific literature is replete with data showing that hypertension can be caused by exposure to heavy metals, such as those found on the American Creosote Superfund Site and the adjacent International Paper DeRidder Creosote Site.  Both are in close proximity to where Ms. Epperson lives and has lived since a very young age.  Accordingly, Ms. Epperson's exposure to toxic chemicals released into the environment by defendants was, more likely than not, a substantial contributing factor to her medical conditions and those of her family members.

**46.**

The proposed Class is at a minimum composed of non-owner residents, home and landowners in the flood plain and subsurface sand and aquifer, between the original sites of contamination and Ashworth's property. Well established laws of physics and hydrology make it more likely than not that all putative class members between the original sites of contamination and the class members property, have the presence of constituent hydrocarbons and/or chemicals

on such property that can only logically be attributed to the residue and waste from the creosoting operations and or the handling and storage that were conducted by IP, Shreveport Creosoting Company or its parent company, American Creosoting Company, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, OCCIDENTAL, and/or BNSF's at one or more locations. For purpose of the initial class boundaries, and reserving the right to amend the class boundary definition subsequent to further testing, and as class certification discovery takes place, Plaintiff hereby attaches as Exhibit "3," the initial geographical boundaries of the proposed Class.

**47.**

As set forth above, and illustrated in Exhibit 3, the initial geographical boundaries of the Class largely (although not exclusively) encompass areas to the South and to the East of Parcels A and B. Based on a series of three related reports issued by the U.S. Environmental Protection Agency ("EPA") after the original complaint was filed in this action (collectively, the "Reports"), the geographical boundaries of the proposed Class encompass additional areas, including areas to the North and to the West of Parcels A and B. Accordingly, as set forth in further detail below, the geographical boundaries of the Class are hereby amended to include all persons and property potentially exposed to and/or contaminated by creosote, creosote constituents, and/or creosote byproducts via the contaminant migration routes described in the Reports. Creosote, creosote constituents, and/or creosote byproducts include the chemicals specified in the Reports.

**48.**

In May 2021, the EPA issued the following three reports concerning its investigation of the contamination of the American Creosote Superfund Site and certain adjacent sites:

**Remedial Investigation Report**, American Creosote DeRidder Superfund Site, DeRidder, Beauregard Parish, Louisiana, EPA Identification No. LAN000604293, dated April 2021 (the "Remedial Report"). https://semspub.epa.gov/work/06/100023287.pdf

**Human Health Risk Assessment Report**, American Creosote DeRidder Superfund Site, DeRidder, Beauregard Parish, Louisiana, EPA Identification No. LAN000604293, dated April 2021 (the "HHRA Report"). https://semspub.epa.gov/work/06/100023204.pdf

**Ecological Risk Assessment**, American Creosote DeRidder Superfund Site, DeRidder, Beauregard Parish, Louisiana, EPA Identification No. LAN000604293, dated April 2021 (the "Ecological Risk Report"). https://semspub.epa.gov/work/06/100023260.pdf

**49.**

The Human Health Risk Assessment Report confirms that the American Creosote Superfund Site "has been impacted by creosote-related compounds from previous timber treatment operations at the property." HHRA, Chapter 1.1. The impact extends to the "adjoining railroad spur property and contiguous wetland stream bed area," including a "pathway of hardened creosote and underlying contaminated soils paralleling [the railroad spur]." *Id*. Based on the EPA's analysis of numerous soil and water samples collected in and around the site, which are catalogued in the Human Health Risk Assessment Report, the EPA "determined that there are significant" carcinogenic and non-carcinogenic human health risks to all "likely current and future receptors (*i.e*., residents, recreational users, commercial workers, and construction workers) as a result of exposure to site soils, sediment, and groundwater." HHRA, Chapter 4.

**50.**

The Ecological Report likewise confirms that toxic creosote constituents and byproducts are present both on and off the American Creosote Superfund Site. For example, "PAHs and other SVOCs were detected in the soil sample collected from within [certain] concrete structure walls. Also, numerous metals were detected in the soil and wastewater samples collected from [a] pit/sunken water retention basin in the foundation of the concrete structure." Ecological Report, Chapter 2.4.1. Elsewhere onsite, the EPA observed "an approximate 1 to 4-inch layer of hardened creosote on top of surface soil." *Id*., Chapter 2.4.4. Similarly, the Ecological Report confirms that

toxic creosote constituents and byproducts are present in "offsite soil and sediment." *Id*., Chapter 2.4.6. For example, "weathered creosote was observed in the soil bordering the private property ponds in the Eastern Offsite Area … [and] in the soil during excavation and construction of [offsite] private ponds." *Id*., Chapter 2.4.6.

**51.**

The Remedial Report memorializes the EPA's initial evaluation of "contaminant migration pathways" from the site. The EPA concluded that the "following migration pathways are present at the site": (i) leaching to groundwater, (ii) groundwater transport, (iii) overland transport, and (iv) sediment and surface water transport. The EPA's investigation focused, however, on the "surface water overland migration" of contaminants. As the EPA explained:

> "The surface water overland migration pathway is the pathway of concern being evaluated for this site. An observed release by chemical analysis has been documented to impact an unnamed drainage ditch/stream, an unnamed perennial stream, freshwater pond, and associated contiguous wetlands." Remedial Report, Chapter 1.2.6.

The Remedial Report observes that "surface water flow across and off the site is controlled by the local topography." Figure 3-4 in the Remedial Report is a "topographical map that presents surface water bodies and the observed surface water drainage pathways across the site," a copy of which is attached hereto as Exhibit 4 ("Figure 3-4"). Blue arrows on Figure 3-4 broadly depict surface water flow across and off the site. The Remedial Report states that "surface water runoff from the site was observed flowing in 3 distinct directions," described as follows in Chapter 3.4:

> **First**: "Runoff flows west and southwest along the western property boundary adjacent to the railroad tracks, then along Crosby Road south approximately 0.60 miles to Palmetto Creek. From Palmetto Creek, the water flows southeasterly and merges into Bundick Creek."

> **Second**: "Surface water on the north third of the property was observed flowing north."

> **Third**: "Runoff also flows towards the southeast corner of the property where it is currently collected in ponds on private property." As the Ecological Report elaborates, a "channel drains

surface water from the site to the private ponds. Creosote is visible in the soils adjacent to the private ponds." Ecological Report, Chapter 2.3

**52.**

With respect to the groundwater plume of creosote contamination, the Remedial Report states that contaminant migration via groundwater "appears to be consistent" with the observed contaminant migration via surface water runoff from the site. As the Remedial Report explains:

> "The flow path of the shallow groundwater unit appears to be consistent with the local topography, with the site sitting upslope from the drainage system making up the Eastern Offsite Area and Western Offsite Area (Figure 3-4)." Remedial Report, Chapter 3.4.3.

However, the EPA noted that the groundwater plume has not yet been "fully delineated," explaining:

> "Groundwater Plume Delineation—The shallow groundwater plume(s) associated with the shallow groundwater situated beneath Former Retort House footprint and the Western Offsite Area have not been fully delineated to the west, southwest, and northwest." Remedial Report, Chapter 8.6.

In addition, the EPA has publicly announced: "Additional sampling will be performed to provide data in some areas to better define the extent of contamination. The main area where additional sampling will be performed is in the western off-site area."

**53.**

With respect to the historical exposure of class members to creosote contamination, the Human Health Risk Assessment Report observes that (i) creosote timber treatment operations commenced on American Creosote Superfund Site in the early 1920s, (ii) there is no evidence of appropriate waste handling, disposal practices, or facility permits, and (iii) no remediation has taken place. Specifically, the Human Health Risk Assessment Report states, in pertinent part:

> "The specific operations at the site consisted of dipping timber into creosote vats, collection of spent creosote in an open pit, and discharge of untreated process wastewater into an open pit. **There is no historical data to indicate that site operations included waste handling, disposal practices, or facility permits.** Abandoned wood treatment

facilities of the previous operations currently remain at the property." HHRA Report at 1 (emphasis supplied).

+++

**"Contamination in the source areas has been documented** to include numerous hazardous substances, including total petroleum hydrocarbons, numerous polycyclic aromatic hydrocarbons (PAHs), and metals.

A number of separate investigations have taken place at the site between 1991 and 2013, and multiple remedial actions have been proposed. However, **to date, no remediation has taken place at the site**." HHRA Report at 2 (emphasis supplied).

**54.**

Accordingly, based on the EPA Reports—and reserving the right to amend the class boundary based on further testing, additional or amended EPA reports or disclosures, and as class certification discovery takes place—Plaintiff hereby attaches as Exhibit "5," the first amended proposed geographical boundaries of the Class (the "Geographical Boundaries"). This map is specifically intended to exclude any and all property in the American Creosote Superfund Site and the adjacent International Paper DeRidder Creosote Site. For the avoidance of doubt, members of the proposed class include persons exposed to creosote contamination within the Geographical Boundaries historically (*e.g*., persons exposed to creosote contamination while residing or working within the Geographical Boundaries but who no longer do so).

**55.**

A sub-class of property residents/owners are those who reside within the proposed geographical area and due to the pollution of their property find it necessary to move from the polluted property. A second subclass of property residents/owners are those who have been physically injured/damaged by the presence of the pollution described above, and a further third sub-class are those who reside within the proposed geographical area who are entitled to medical monitoring due to the exposure to the hazardous and toxic pollution described herein which has

been allowed to migrate from the Defendants' custody and garde onto the Plaintiff's and class members' properties or properties where class members reside.

**56.**

Numerosity, in compliance with FRCP 23, is satisfied as there are hundreds of land and home owners similarly situated as Plaintiff, in and near the Satcherville and other neighborhoods east and southeast of the City of DeRidder, and IP's former plant locations, which lie in the flood plain in which it appears that much of the subsurface migration has progressed, and undersigned counsel has at present approximately four hundred (400) such home and land owners as claimants.

**57.**

Commonality, in compliance with FRCP 23, is satisfied as the issues of liability and facts pertinent thereto are entirely common to all putative class members against these Defendants, which can be traced to the operations of IP and its ancestors, Shreveport Creosoting Company or its parent company, American Creosoting Company, and/or BNSF, and with regard to the tortious conduct complained of, such is uniform as to all class members, and the resolution as to the issue of liability will affect a significant number of class members if not all of them.

**58.**

Typicality, in compliance with FRCP 23, is satisfied as to the proposed class, as the Plaintiff's claims for either the costs for remediation of her property and restoration of same to its original condition, and/or the establishment of a buy out and relocation fund, and or damages for diminution of the value of Plaintiff's property, and or additionally a court ordered/injunction which requires the Defendants to adequately and reasonably remediate its old plant locations in order to stop and abate the leaking and then migration of the chemical wastes and pollution from its property, are all remedies that are common and typical as to all members of the proposed class. Further, the physical harm, illnesses, and medical monitoring to which the Class is entitled are all

likely to be similar in nature as to the sub-class members, and such treatment and monitoring is more economical if such remedy is considered as a Class.

**59.**

The Plaintiff and undersigned counsel are able to fairly and adequately represent the claims of the other class members and counsel's representation of close to four hundred land and homeowners similarly situated as Plaintiff is proof of the "sufficient stake" necessary for compliance with FRCP 23. Additionally, Perry R. Sanders, Jr., one of the proposed attorneys who requested the Court appoint the undersigned as Class Counsel, has extensive experience as Class Counsel, and previously has been appointed lead class counsel in both Federal and State Court and has never been turned down by any court where it has been requested that he be appointed lead or co-lead counsel in any class action, including in Calcasieu Parish which is within the judicial district where this case is filed.

**60.**

Common issues of law and fact predominate the claims of the proposed class members, in compliance with FRCP 23, as to the existence of the chemicals on and under each class member's property, the origin of the chemicals that have been and are likely to be found on proposed soil and water testing, whether IP's, and the other Defendants' conduct in their operations were reasonable or not; all of these issues and more of which show that each individual class member's claim contain a multitude of common issues as to the entire class on the issue of liability, and as stated above in preceding paragraphs the relief sought for the Class is uniform in nature.

**61.**

The superiority of a Class Action mode of litigation under FRCP 23, as opposed to individual claims, is satisfied in this case for the following reasons: the economic burdens of individual cases would be difficult and unrealistic for individual members to carry, and the class

members, since they are all neighbors, share a common interest in achieving a group remedy which would be much more difficult, costly, and protracted if the case were pursued on an individual basis, therefore the individual claimant's interest in controlling their claims separately is subordinate to the Class' interests in pursuing a remedy for all members of the proposed class; there are currently no existing individual cases by members of the proposed class of which proposed Class Counsel is aware, the Plaintiff, on behalf of the members of the proposed class, believes that consolidating the litigation in this single forum is the most practical and least burdensome manner in which to proceed with this litigation, as opposed to individual suits for the causes of action expressed herein, spread out through different federal or state courts and through various divisions of each court system; and Plaintiff does not believe there will be any untoward or extraordinary difficulty in management of the proposed class and sub-classes once certified by the Court; additionally as in all such Class Actions there will be a mechanism complying with due process to allow putative class members to opt out of said class.

**62.**

Plaintiff and similarly situated persons demand TRIAL BY JURY.

**<u>Damages and Relief Sought</u>**

**63.**

The Plaintiff and members of the proposed class seek damages and relief/recovery under Louisiana law in the following manner:

a. Sufficient funds to conduct a complete scientific investigation of the extent and nature of the contamination on their property associated with the Defendants' generation, transportation, storage, handling, and management of wood treating materials and wastes, on, adjacent to, or in the vicinity of the class members' properties;

b. All costs of restoring Plaintiff's property to its original uncontaminated condition along

with the relief sought in subparagraph "c." below;

c.   Injunctive relief and or all costs associated with, and the Court Ordering, that IP, KERR-MCGEE, KERR-MCGEE OPERATING, ANADARKO, OCCIDENTAL, as well as BNSF excavate and remove all former and abandoned and damage causing structures of continued discharge and disposal of wood treating wastes constituents disposed of on or under their current or former properties for which they are legally responsible, such as the surface impoundments, pipelines, pumps, tanks, contaminated tank containment areas, and other worn, deteriorating, or leaking equipment, facilities or structures, and implementation of a remediation system to halt and abate the continued leakage and migration of pollutants from IP's, Shreveport Creosoting Company and its parent company, American Creosoting Company, and BNSF's current as well as former properties;

d.   Alternatively, to damages for the costs of the remediation of Plaintiff's property, that the Court establish a "Buy Out Fund" to relocate the Plaintiff and members of the class to another location as a remedy considering the costs of remediating Plaintiff's and the class members' property, a remedy which has been invoked by Congress under similar conditions and which is within the plenary power of the U.S. Courts under Article III of the United States Constitution and which methodology has been used within the geographical confines of the Western District of Louisiana;

e.   Punitive and exemplary damages;

f.   Damages for the diminution of value of the putative class members' property due to the migration of the toxic and hazardous chemicals onto their property;

g.   Damages for the annoyance and inconvenience occasioned by the presence of the chemicals on the putative class members' property as well as the unlawful trespass due to the chemicals having migrated onto their property;

h. Damages for the physical harm and ill health effects caused by the presence of the pollution on the class members' properties, as well as the mental anguish, worry, and anxiety suffered by them due to the knowledge of the presence of the toxic waste on and under their property;

i. The costs of medical monitoring of all sub-class members who reside within the geographical boundaries of the proposed class due to the increased risk of disease as pled above.

Wherefore, the Plaintiff prays that the Defendants be cited to appear and answer this Complaint, and that after all due proceedings be had, that there be judgment entered herein as follows:

1. That the proposed class described herein be certified by the Court and that Plaintiff be certified as the Class Representative;

2. That Plaintiff and the members of the proposed class be awarded compensatory damages in an amount to be proven at trial against all Defendants *in solido* to include either the costs to restore the class members' land to its original unpolluted state, damages for Defendants unlawful trespass and tortious interference with the use and convenience of the use of the class members' property, and damages for physical harm, and mental anguish caused by the Defendants' conduct which has resulted in the presence of the toxic chemicals on Plaintiff's and class members' property;

3. That a medical monitoring fund be established at the costs of the Defendants to provide for the monitoring of all class members who chose to participate in such monitoring program;

4. That punitive damages be awarded against all Defendants *in solido*;

5. That alternatively IP be ordered to establish a "Buy Out" fund in which Plaintiff's and

the class members' property will be valued by its pre-pollution condition and state, in order for the Plaintiff and members of the class to move to another location to live so as not to be unreasonably subjected to toxic and hazardous chemical pollution in and under their homes and property;

6. That Defendants be ordered to pay the costs for Plaintiff to conduct a comprehensive and expedited environmental assessment of Plaintiff's, as well as members of the class, land to identify all hidden and not yet identified pollution on said lands and property;

7. That Defendants be ordered by affirmative injunctive relief to fully remediate its former creosote plant sites so as to abate and stop the unlawful leaking and migration of toxic and hazardous chemicals from its property as stated above.

8. That all costs of these proceedings be taxed against the Defendants including all experts costs and costs of obtaining any remediation plan and its implementation.

9. For all just and equitable relief, and any other category of damages for which the evidence and circumstances support in the premises.

Executed February 28, 2024

Respectfully submitted,

BY: /s/ David L. Wallace
    Attorney at Law
    La. Bar Roll #13196
    518 North Pine Street
    Post Office Box 489
    DeRidder, Louisiana  70634
    (337) 462-0473 (telephone)
    (337) 202-4070 (facsimile)
    wnblawoffice@bellsouth.net

    /s/ Perry R. Sanders, Jr.
    Sanders Law Firm, LLC
    31 N. Tejon, Suite 400
    Colorado Springs, CO 80903
    (719) 630-1556 (telephone)
    (719) 630-7004 (facsimile)

perry@scclaw.net

*/s/ Andrew K. Glenn*
Andrew K. Glenn
Glenn Agre Bergman & Fuentes
LLP
1185 Avenue of the Americas
New York, NY 10036
Tel. 212.970.1600